ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

GEORGE O. HAGEMAN (CABN 332457)
ASEEM PADUKONE (CABN 298812)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5044
    Fax: (408) 535-5081
    George.Hageman@usdoj.gov
    Aseem.Padukone@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CASE NO. 5:17-CR-00068-EJD-12** |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Court: Hon. Edward J. Davila |
| JOSE NOE RAMIREZ-AVELAR, <br>    a/k/a "Chepito," <br>    a/k/a "Sparky," | Hearing Date: December 9, 2024 <br> Hearing Time: 10:00 a.m. |
| Defendant. | |

## I. INTRODUCTION

Defendant Jose Noe Ramirez-Avelar, a member of the Northern California La Mara Salvatrucha ("MS-13") Enterprise, was one of three shooters in the September 22, 2016, killing of a man whom Ramirez-Avelar wrongly believed was a rival gang member. Afterwards, he laughed about his accomplishment with other gang members. He was also involved in the destruction of evidence from a different murder in May 2016. Based on the need for the sentence to reflect the seriousness of the offense, to afford adequate deterrence, and to protect the public from further crimes by the defendant, the government submits that 23 years' imprisonment is sufficient, but not greater than necessary, to achieve the goals set forth in 18 U.S.C. § 3553(a).

## II. PROCEDURAL HISTORY

On August 16, 2018, Ramirez-Avelar was charged in the Second Superseding Indictment with five counts related to his involvement in the Northern California MS-13 Enterprise: (1) racketeering conspiracy in violation of 18 U.S.C. § 1962(d); (11) conspiracy to commit murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5); (12) murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1); (13) discharge of a firearm in furtherance of a crime of violence in violation of 18 U.S.C § 924(c)(1)(A); and (14) use of a firearm in furtherance of a crime of violence resulting in death in violation of 18 U.S.C. § 924(j)(1). Dkt. 147. He was additionally listed in Special Sentencing Factors One (conspiracy to commit murder of Victim 2), Three (murder of Victim 2), and Four (conspiracy to distribute and possess with intent to distribute controlled substances). *Id.*

On August 19, 2024, Ramirez-Avelar pleaded guilty to Counts One, Eleven, and Fourteen pursuant to a Rule 11(c)(1)(C) plea agreement. PSR ¶ 5. Sentencing was set for December 9.

## III. OFFENSE CONDUCT

a. *The Northern California MS-13 Enterprise*

From at least January 2013 until at least February 2017, a gang known as the Santa Cruz Salvatruchas Locos ("SCLS" or "SCSL") existed in Santa Cruz, California. SCLS is a clique or subset of the transnational gang called La Mara Salvatrucha ("MS-13"). *Id.* ¶ 25. MS-13 is organized into "cliques," that is, smaller groups that typically operate in a specific city or region. Each clique has a name

UNITED STATES' SENTENCING MEMORANDUM   1
5:17-CR-00068-EJD-12

and its members and associates meet and work together to carry out their illegal activities for their own individual benefit, the benefit of the particular clique, and the benefit of MS-13 generally. MS-13 cliques fight with rival Sureño, Norteño, and 18th Street gang members for control of territory in which to conduct narcotics trafficking, extortion, and other crimes, as well as to recruit and influence non-gang members. *Id.* ¶ 22. Sometimes MS-13 gang members from different cliques combine to engage in illegal activities, including narcotics trafficking and murder, or to seek protection against rival gangs. *Id.*

Within the ranks of MS-13, gang members earn promotion and prestige by proving themselves through the commission of criminal activities benefitting the gang. MS-13 members commit crimes such as extortion and narcotics trafficking to enrich themselves. MS-13 members also engage in acts of violence, including murder and attempted murder, against their rivals, as well as against other MS-13 members who committed significant violations of MS-13 rules. Such violence earns the individual gang member respect and prestige within the gang. *Id.* ¶ 23.

From at least January 2013 until at least February 2017, MS-13 operating in Northern California, including its leadership, members, associates, and recruits, including SCSL and another clique known as "Park View," constituted the Enterprise charged in the Second Superseding Indictment. *Id.* ¶ 25. Ramirez-Avelar was an active member of this Enterprise. He was a recruit within SCLS beginning in February 2015, and then became an active member of SCLS in February 2016. *Id.* ¶ 27. He agreed to participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, and agreed that Enterprise members would commit at least two acts of racketeering in the conduct of the affairs of the Enterprise, including acts involving: (i) murder, conspiracy to commit murder, and attempted murder; (ii) arson; and (iii) extortion, as well as offenses involving dealing in controlled substances. *Id.* ¶ 30.

b. *Murder of Victim 2 on September 22, 2016*

In April 2016, co-defendant Tomas Rivera arrived in Santa Cruz from El Salvador and assumed the No. 2 role in SCSL. *Id.* ¶ 31. Around this time, the gang began searching for additional targets to murder. One of those targets was Victim 2, who lived in SCSL territory and was suspected (incorrectly) of being a rival 18th Street gang member. *Id.* Victim 2's picture was sent to El Salvador in order to gain approval for the murder from higher-ranking MS-13 members. Once approval was received, the group

plotted different ways to kill Victim 2 at various gang meetings. Ramirez-Avelar and co-defendant Erick Escalante-Torres were both involved in these planning sessions throughout the summer of 2016, discussing the logistics of how to actually commit the murder. *Id.*

On September 22, 2016, Ramirez-Avelar and co-defendants Erick Escalante-Torres and Alexander Martinez-Flores went to Victim 2's neighborhood. *Id.* ¶ 32. They knew from previous surveillance that Victim 2 would leave his home and walk to a nearby taco shop where his fiancée worked in order to walk her home after the end of her shift. *Id.* That night, at around 12:45am, Ramirez-Avelar, Escalante-Torres, and Martinez-Flores all shot their firearms at Victim 2. *Id.* Ramirez-Avelar's gun jammed. Escalante-Torres and Martinez-Flores chased after Victim 2 and killed him. *Id.* An autopsy showed that Victim 2 had four gunshot wounds in the back from at least two different calibers. *Id.* At a gang meeting afterwards, Ramirez-Avelar celebrated the murder by hugging and laughing with other gang members. *Id.*

  c. *Other Criminal Conduct*

Ramirez-Avelar, despite being only a recruit and not a full member until after the September 2016 murder, was nevertheless involved in many of the gang's activities. He patrolled SCSL territory for rivals to attack, and on one occasion beat up a suspected rival gang member on their turf. *Id.* ¶ 33. He assisted in the collection of an extortion payment from a drug dealer selling methamphetamine on SCSL territory. *Id.* ¶ 34. He drove the vehicle used in an MS-13 murder in Novato to a remote location near Santa Cruz and then helped destroy the evidence by setting it on fire. *Id.* ¶ 35. He possessed firearms on at least four occasions in July 2016, September 2016, January 2017, and February 2017. *Id.* ¶ 36. Even after his incarceration for the instant case, his criminal activity continued: he was found with a jail-made shank hidden in his cell in March 2022, and was involved in the group beating of a fellow MS-13 inmate in November 2022. *Id.* ¶ 7.

**IV.   SENTENCING GUIDELINES CALCULATION**

The government agrees with a total offense level of 40, after considering acceptance of responsibility. *Id.* ¶ 47. The government agrees that Ramirez-Avelar is in Criminal History Category I. *Id.* ¶ 63. Together, his advisory guidelines range is 292 to 365 months. *Id.* ¶ 91. The maximum sentence for Count Eleven is 10 years' imprisonment. *Id.* ¶ 90. Count Fourteen has a maximum of life, no

mandatory minimum, and it may run either consecutively or concurrently. *See Lora v. United States*, 599 U.S. 453, 455, 462 (2023).

## V.   APPLICABLE LAW

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense; (3) the need for the sentence to afford adequate deterrence; (4) the need for the sentence to protect the public from further crimes of the defendant; (5) the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

## VI.   RECOMMENDED SENTENCE AND SECTION 3553(a) FACTORS

Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a)—and in particular the seriousness of the offenses, need for deterrence, and need to protect the public—the government respectfully recommends a sentence of 23 years' imprisonment, the high-end of the 22- to 23-year range agreed to in the parties' plea agreement.

   *a. Malice Before and After*

The facts of the September 22, 2016, murder are particularly galling. This was a long-planned, well thought-out, targeted hit of a man they perceived to be a rival gang member. They surveilled him to determine the ideal time to strike, which they determined to be when he left his house around midnight

UNITED STATES' SENTENCING MEMORANDUM   4
5:17-CR-00068-EJD-12

every night to walk to the nearby taco shop where his fiancée worked and walk her home safely. Though gang affiliation of the victim is of course no defense to murder, it is worth noting that the victim had no gang affiliation at all. He was just a resident of the neighborhood who loved his fiancée. Ramirez-Avelar participated in all of this planning and was one of three shooters. And though he did not fire the killing shots or chase after the victim, it would appear that was more a consequence of his gun jamming than of any sort of change of heart. Afterwards, Ramirez-Avelar celebrated the murder with his fellow gang members, hugging and laughing like it was a game. This demonstrates his utter lack of remorse for his actions. Though he may have had a lesser role than the other two shooters, he was still a shooter who planned it beforehand and celebrated afterwards.

   *b. Broad Range of Criminal Activity*

Ramirez-Avelar is "only" charged with one shooting, yet he has involvement in a number of different facets of the MS-13 enterprise. He has personally assisted with extortion, used violence to maintain the gang's turf, destroyed evidence, unlawfully possessed firearms, and disciplinined other gang members. His activity continued over several years before and after contacts with law enforcement, and even continued after his incarceration for murder. The jail-made shank found in his cell coupled with his participation in a gang-related beating at Santa Rita Jail demonstrates that Ramirez-Avelar has no desire to cease his violent gang activities. The lengthy period of incarceration recommended by the government is necessary in order to deter his violent conduct, ensure public safety, and to provide just punishment for his actions.

   *c. Personal History and Characteristics*

Ramirez-Avelar was 26 years old at the time of the murder in September 2016. This was not a situation where a young man with a still-developing brain makes a bad decision. He chose to take the life of another, without any regard for the lasting damage his actions caused that man's family and friends forever. As noted above, he has continued his bad conduct even after being incarcerated. Ramirez-Avelar must now live with the consequences of his very deliberate choices.

**VII. VICTIM IMPACT**

The fiancée of Victim 2—the woman who Victim 2 was walking to escort back home on the night

UNITED STATES' SENTENCING MEMORANDUM   5
5:17-CR-00068-EJD-12

he was killed—has submitted a Victim Impact Statement that was previously provided to Probation and the defense. Her pain is raw and real, even eight years later. She describes that terrible night. How she heard screams but didn't think much of it at first. How she saw the sweater, that he would always bring for her to brave the cold walk home, lying on the ground. How she realized the screams were his screams, ran back towards him, and saw him bloody on the ground unable to speak. How the life they had planned together vanished in an instant, and how she blamed herself even though of course she is not at fault. She concludes her letter by stating that all she wants is "justice for [him] so he can rest in peace." *Id.* ¶ 42.

## VIII. CONCLUSION

Jose Noe Ramirez-Avelar was one of three shooters in the gang killing of a perceived rival gang member in September 2016. He is "fortunate" in that his gun jammed during the shooting, making him less culpable than his fellow shooters. Yet even so, his involvement in the planning and his intent when pulling that trigger is just as culpable as the rest. On top of that is his prolific gang activity in other areas like extortion, gang discipline, and firearms possession. He did all this in order to increase his reputation and position within the MS-13 gang. He merits a lengthy custodial sentence of 23 years, a just punishment to someone who committed the most serious of offenses and one that would keep him in custody until he is approximately 50 years old and has hopefully aged out of the life he has led so far. The government submits that this sentence is sufficient, but not greater than necessary, to accomplish the goals set forth in 18 U.S.C. § 3553(a).

DATED:  December 2, 2024                    Respectfully submitted,

                                            ISMAIL J. RAMSEY
                                            United States Attorney

                                            */s/*
                                            GEORGE O. HAGEMAN
                                            ASEEM PADUKONE
                                            Assistant United States Attorneys